## JAMES BEATTIE
### vs.
## JOHN F. LAWLOR, INC., ET AL.

Superior Court     ·New Haven County        File #53044

## MEMORANDUM FILED MAY 17, 1938.

Joseph Shelnitz, of New Haven, for the Plaintiff.

Pond, Morgan & Morse, of New Haven; Evans & Markle, of New Haven, for the Defendants.

FOSTER, J.   First Avenue in West Haven runs north and south and is intersected by Main Street running east and west. First Avenue is 31½ feet wide from curb to curb.

About 3:30 a.m. on May 15, 1937 the plaintiff, an operator of a milk truck, travelling north on First Avenue, parked his truck very near to the east curb some considerable distance south of Main Street.

The defendant, Chester A. Congdon, at about midnight that night had hired a convertible coupe from the defendant, John F. Lawlor, Inc., and, accompanied by his brother, John, and a friend, Moseley, drove to Savin Rock, where they

patronized the various amusements there conducted. About 3:30 a.m., Congdon, with the other two young men seated beside him, was driving north on his right side of the center line of First Avenue, but near to the center line, at a speed of 25 to 30 miles per hour. As he looked ahead of him, he saw the rear lights of the milk truck, when he was one or two blocks away from it, but he thought it was moving. When he was yet some considerable distance from the milk truck, an automobile entered First Avenue from Main Street, coming from the east and proceeding south on First Avenue on its right side of the center line of the highway. The weather was damp. The pavement was damp. There was a windshield wiper on Congdon's automobile, but it was not then being operated by Congdon. The glare of the head-lights of the south bound automobile blinded Congdon for the moment. He reduced his speed a little and turned his automobile somewhat to his right, so as to be sure that he would not collide with that automobile. Just as he had passed that automobile, he observed the parked milk truck 15 or 20 feet ahead of him. He threw on his brakes and turned to his left, but did strike the milk truck in the rear.

The Court feels that it should briefly comment on the con-duct of Congdon and his two associates. They were young men, Congdon being then 21 years of age, and his brother and friend 17 years of age. It is true that they were out late, but there is no evidence that they had been guilty of any reprehensible act. It is true that two hours or more be-fore the collision, they had consumed some beer, but there is not a scintilla of evidence that they were in the slightest degree intoxicated. They all came from a distance to testify in this case, and their demeanor on the witness stand was that of fine, honest, upright men, acting with no desire to shield or justify themselves or to evade responsibility or the truth.

Chester Congdon must, under the law, be held to have observed not only what he did observe, but also what, in the exercise of reasonable care, he ought to have observed. He saw the milk truck ahead of him on his side of the highway, when he was a block or more away from it. He did not know whether it was moving or standing still, but he did know or should have known that, if it was moving, he was catching up with it. He knew or should have known that there was room for him to pass to the left of the truck and

yet remain on the right of the center of the highway. When the lights of the automobile approaching from the opposite direction momentarily blinded him, he knew or should have known that, if he steered his automobile further to his right, he would be in the rear and in the path of the truck. It is clearly in evidence that, if Congdon had kept a straight course, when the approaching automobile momentarily blinded him, he would have collided neither with that automobile nor with the truck. When he was so momentarily blinded, had he stopped his automobile, there would have been no collision. In failing, under such circumstances, to keep straight on his course or to stop his automobile, he did not use that care that a reasonably prudent man would have used under such circumstances. It follows that the Court must find Chester A. Congdon guilty of negligence that was a proximate cause of the collision with the milk truck, and a proximate cause of the injuries received by the plaintiff, who at the time was standing in the milk truck. The Court finds that the plaintiff was not guilty of any contributory negligence that was a proximate cause of his injuries.

Since it is undisputed that Chester A. Congdon rented from the defendant, John F. Lawlor, Inc., the automobile that he was operating, it follows that John F. Lawlor, Inc., is liable to the plaintiff to the same extent as is Chester A. Congdon (Gen. Stat. [1930] §1627).

The plaintiff was employed as a milk salesman and deliverer for the same employer for 15 years prior to being injured in this collision, receiving an average wage for a long time prior to the collision of $36.64 per week. He was at that time 62 years of age and had worked steadily for over 40 years without idleness. His injuries and the prognosis of his present condition as described by Dr. Cook are in part as follows:

Q. Now Doctor—are you able to tell us when it was you first saw him, Doctor? A. May 26, '37.

Q. And where did you see him? A. At my office.

Q. And will you please tell us what you found? A. Findings were tenderness and limitation of motion in the neck, both on rotating it and lateral bending, also pain in the back. He was tender chiefly in the left sacro-iliac region. He had slight muscle spasms in the lumbar region, a little more marked on the left. He had some tenderness in the left arm in the neighborhood of the shoulder. The x-rays of the neck were

negative, so far as fracture is concerned.

Q. On November 8th what were your findings? A. He was improved so far as the neck and shoulders were concerned. He still had a great deal of pain in the lower back.

Q. You said he had pain in the lower back? A. Yes.

Q. Whether or not, in your opinion, he was still then disabled from doing his customary work? A. I thought so.

Q. Now, you saw him again on May 2nd, Doctor? A. May 2nd, 1938.

Q. And what were your findings on May 2nd, 1938? A. His pain in the neck and shoulder cleared up, and his trouble is limited to the lower lumbar spine, and that includes the—— the neighborhood of the 5th lumbar and sacrum, and he has some moderate pain over both sacro-iliac joints.

Q. Will you please explain in non-medical language what you mean when you talk of the 5th lumbar and the sacrum? A. The 5th lumbar vertebra is the vertebra in the spine just above the sacrum, and one means by that that he still has evidence of a sprained back in the neighborhood of the 5th lumbar and the 1st sacral vertebra; lumbo-sacral sprain, with a pain around the sacrum, sacro-iliac joint. Those are the joints between the sacrum and the pelvic bones on the side, and his continuance of pain there indicates that he has some sprain of both sacro-iliac joints.

Q. In other words, Doctor, from your indication of the portion affected in his back, it would embrace the middle and both sides of the back, would it not? A. In the lower back.

Q. In the lower back. Is that a part of the anatomy that is material for a person who has to do work such as Mr. Beattie would have to do carrying milk? You found out what his business was, I assume? A. He was—had a milk route.

Q. Yes. With this condition as of the present time prevent him from doing his work? A. I think it is still too painful.

Q. And are you able to express an opinion, Doctor, as to the duration of this condition which would incapacitate him from performing any work of this type? A. I think two years.

Q. You mean by that, that for two years from now, in

addition to the time that has elapsed, that it would be a total incapacity to perform his work, due to his condition? A. That is as near as I can tell.

Q. Well, to the best of your ability, that is the duration of time that you would give as a prognosis of disability, is that correct? A. That is my estimate.

Dr. Ematrudo makes a prognosis that the plaintiff's injuries are permanent. The defendants offered no evidence as to the plaintiff's injuries. The Court accepts the prognosis of Dr. Cook as to the probable duration of the plaintiff's incapacity. The plaintiff has been in bed many weeks since receiving his injuries and has required the care of a nurse about 16 weeks. The plaintiff has suffered much pain and it is evident to one watching him from time to time during the trial of the case that he still suffers pain and much discomfort. There is no evidence of malingery nor of traumatic neurosis. His loss of wages for about 3 years is about $5,700.

His expenses for medical treatment and medicines during the past year are about $700; his medical treatment in the future will be about $150 per year.

The General Ice Cream Corporation has intervened as party plaintiff.

Judgment is rendered that the plaintiffs recover from the defendants damages of $14,700.

The Court will hear the plaintiffs relative to the apportionment of such damages in accordance with section 5231 of the General Statutes (Revision of 1930).